# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA,　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　Plaintiff,　　　　) | Case No.: 2:16-cr-00265-GMN-CWH |
| 　vs.　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　　　　　　　　　　) | **ORDER** |
| PASTOR FAUSTO PALAFOX, *et al.*,　　) | |
| 　　　　　　　　　　　　　　　　　　) | |
| 　　　　　　　　　Defendants.　　　　) | |
| _____) | |

Pending before the Court is the Sealed Motion to Suppress Evidence Obtained Through Unlawful Wiretaps, [1] (ECF Nos. 1198–1203), filed by Defendant Pastor Fausto Palafox ("Palafox"). The Government filed an errata Response, (ECF No. 1342), and Palafox filed a Reply, (ECF No. 1361).[2] The Court held hearings on March 5, 2019, (ECF No. 1537), and on April 4, 2019, (ECF No. 1560).[3]

///

///

---

[1] This Motion is sealed pursuant to the Honorable Judge Carl Hoffman's Order, (ECF No. 434), dated October 12, 2017.

[2] Defendant Diego Chavez Garcia ("Garcia") filed a Motion for Joinder to Palafox's Reply, arguing that intercepted conversations should not be admitted against him because the Government represented that he was neither a target subject nor intercepted. (Mot. for Joinder 2:1–7, ECF No. 1367). The Government filed a Motion to Strike Garcia's Motion for Joinder, asserting that Garcia failed to cite authority in support of his argument, thus violating Local Rule LCR 47-3. (Mot. to Strike 2:4–7, ECF No. 1377); *see also* L.R. LCR 47-3 ("The failure of a moving party to include points and authorities in support of the motion constitutes a consent to denying the motion."). After review of Garcia's Motion, the Court agrees with the Government. Accordingly, the Government's Motion to Strike, (ECF No. 1377), is **GRANTED**, and Garcia's Motion for Joinder, (ECF No. 1367), is **STRIKEN.**

[3] During the April 4, 2019 hearing, Palafox presented PowerPoint slides, marked as Exhibit A, and a map, marked as Exhibit B. (Mins. Proceedings, ECF No. 1560). The Government also presented PowerPoint slides. (*Id.*). On April 5, 2019, the Government filed a copy of its PowerPoint slides on the docket. (Notice of Ex. in Support of Resp., ECF No. 1559).

Also pending before the Court is the Government's Motion for Leave to File Excess Pages, (ECF No. 1338), and Palafox's Unopposed Motion for Leave to File Excess Pages, (ECF No. 1360). [4]

Also pending before the Court is Defendant Ernesto Manuel Gonzalez's ("Gonzalez") Motion for Leave to File or Join a Wiretap Suppression Motion for Lack of Necessity Under 18 U.S.C. § 2518, (ECF No. 987). The Government did not file a response. Defendants Albert Benjamin Perez ("Perez"), Robert Alan Coleman ("Coleman"), Garcia, Johnny Russell Neddenriep ("Neddenriep"), Paul Jeffrey Voll ("Voll"), John Chrispin Juarez ("Juarez"), and Bert Wayne Davisson ("Davisson") filed Motions for Joinder, (ECF Nos. 994, 1018, 1023, 1029, 1079, 1087, 1111).

## I. BACKGROUND

This case arises from a long-term investigation into the alleged criminal conspiracy of Vagos Motorcycle Club ("Vagos"), an alleged motorcycle gang. (Superseding Indictment, ECF No. 13). This investigation resulted in a Superseding Indictment returned against Palafox and 22 others. (*Id.*). As a part of the investigation, the Government applied for and received several orders authorizing the interception of many of the defendants' phone lines. (*See generally* Exs. A–Q, ECF Nos. 1198–1202). The first wiretap order, obtained as an emergency wiretap application under California state law, intercepted the phone line of Mario Enrique Ayala ("Ayala"), an alleged member of the Vagos. (*See* Ex. B at 00042–51, ECF Nos. 1198-1, 1198-2). Thereafter, the Government sought and received two additional California state law wiretap authorizations. (*See* Exs. C, D, ECF Nos. 1198-1, 1198-2). Applications for these wiretaps are supported by an affidavit executed by Sergeant Erick Bennett ("Sgt. Bennett"), a police officer with the San Bernardino Police Department Narcotics Unit. (*Id.*). In August 2010, the Government applied for the first of nine federal wiretap authorizations. (*See* Ex. E, ECF Nos.

---

[4] Given that both Motions are unopposed, the Court **GRANTS** these Motions, (ECF Nos. 1338, 1360).

1198-3, 1198-4, 1198-5).  The federal applications include affidavits executed by Special Agent

Matthew Neal ("Special Agent Neal") of the Department of Homeland Security. (*Id.*).  The last

wiretap authorization was secured in April 2011. (*See* Ex. M, ECF No. 1202).

### A. Investigative Background Relating to Wiretap Applications [5]

In March 2010, the Drug Enforcement Agency (DEA) began its investigation of Ayala.

(Errata Resp. ("Resp.") 6:21–7:5, ECF No. 1342).  Special Agent Andrew Spillman ("Special

Agent Spillman") of the California Department of Justice assisted the DEA Riverside District

Office with a narcotics investigation where a confidential reliable informant ("CRI") posed as a

narcotics supplier of marijuana and cocaine. (Ex. A at 00008–10, ECF No. 1198-1).  The CRI

sold 900 pounds of marijuana to Jesus Tellez-Hernandez ("Tellez-Hernandez"). (*Id.* at 00010).

Law enforcement followed Tellez-Hernandez to an industrial building and procured a search

warrant for the location. (*Id.*).  Law enforcement executed the warrant, seized the marijuana,

recovered $700,000, and arrested five suspects, including Tellez-Hernandez, who was later

released on bail. (*Id.*).  After his release, Tellez-Hernandez solicited the CRI for 40 kilograms

of cocaine in April 2010. (*Id.*).  In connection with the request, Tellez-Hernandez introduced

the CRI to Ayala. (*Id.*).  Ayala "identified himself to the CRI as the 'Sergeant at arms' for the

Vagos outlaw motorcycle gang and that he was in fact the person that would be purchasing the

cocaine." (*Id.*).  Ayala contacted the informant on several occasions to discuss the purchase of

cocaine and stated that he could provide the CRI with heroin. (*Id.*).  Ayala also indicated that he

would kill anyone the CRI wanted in order to show his loyalty to the CRI. (*Id.*).  Ayala gave the

CRI his cellphone number and the two later met and exchanged samples of cocaine and heroin.

(Ex. B at 00038–39, ECF No. 1198-1).

---

[5] In his Motion, Palafox presents substantive arguments only as to the first five wiretap authorizations. (*See generally* Mot., ECF No. 1198).  Accordingly, the instant Order provides factual background only as to those five wiretaps.

On May 7, 2010, the informant met with Tellez-Hernandez and Ayala. (*Id.* at 00039). During this meeting Tellez-Hernandez asked the informant and Ayala to assist him in locating Roberto Bautista ("Bautista"), the individual Tellez-Hernandez suspected of being responsible for his March arrest. (*Id.*). Tellez-Hernandez requested that the CRI and Ayala help steal money and drugs from Bautista, and kill him. (*Id.*). The CRI declined to assist Tellez-Hernandez, but heard Ayala communicate his willingness to help rob and kill Bautista. (*Id.* at 00039–40). Law enforcement officials then contacted Bautista and warned him of the murder plot. (*Id.* at 00040).

## 1. May 2010 Wiretap Application and Order

Special Agent Spillman sought the first wiretap, an emergency request, on May 10, 2010. (*Id.* at 00042, 00052). The Superior Court of California, County of San Bernardino ("San Bernardino Court") granted the request the same day. (*Id.*). An application was then submitted by the Assistant District Attorney for the County of San Bernardino, two days later, seeking to extend the wiretap for an additional 30 days. (*See id.* at 00011). The target telephone was the cellphone primarily used by Ayala ("TT1"), and the target subjects were Ayala and Tellez-Hernandez. (*Id.* at 00016–17). The objectives of the investigation were, *inter alia*, to obtain evidence against "the participants and/or conspirators in the Conspiracy to Commit Murder and the Solicitation to Commit Murder of Roberto Bautista." (*Id.* at 00020). The San Bernardino Court granted the issuance of the wiretap. (*Id.* at 00035).

## 2. June 2010 Wiretap Application and Order

On June 9, 2010, Sgt. Bennett applied to continue the wiretap on Ayala's phone. (Ex. C at 00062, 00065–66). The only target telephone was the cellphone primarily used by Ayala. (*Id.* at 00068). The application requested to intercept the communications between Ayala and additional co-conspirators, known and unknown. (*Id.* at 00066). In addition to Ayala, the application identified Tellez-Hernandez, Fred Alfonso Mendoza ("Mendoza"), Charlie, Larry,

and Oscar as target subjects. (*Id.* at 00068–69). The objective of the wiretap included determining the role of the target subjects in the Vagos' criminal activity and their role in the solicitation of Bautista's murder. (*Id.* at 00073–74). Law enforcement also sought to identify additional Vagos members and the location of any evidence related to the Vagos' alleged crimes. (*Id.*). In support of his application, Sgt. Bennett summarized many of the intercepted calls from the May 2010 wiretap. (*Id.* at 00078–93; 00119). Sgt. Bennett stated that these calls reflected, *inter alia*, narcotics transactions and trafficking, orders to assault an unidentified third party, Vagos business, and a murder committed by a rival gang. (*See id.*). The San Bernardino Court granted the issuance of the wiretap. (*Id.* at 00130).

### 3. July 2010 Wiretap Application and Order

On July 9, 2010, Sgt. Bennett applied to continue the interception of calls to and from Ayala's cellphone for an additional 30 days. (Ex. D at 00211, ECF No. 1198-2). Sgt. Bennett identified Ayala, Tellez-Hernandez, Mendoza, Charlie, Larry, and Oscar as target subjects. (*Id.* at 00148). The objectives of the wiretap were essentially the same as the objectives of the June 2010 wiretap. (*Id.* at 00153). The San Bernardino Court granted the issuance of the wiretap. (*Id.* at 00210).

### 4. August 2010 Wiretap Application and Order

On August 27, 2010, the first federal wiretap application was approved by the United States District Court for the Central District of California to intercept phones operated by Ayala, Charles Randall Vaden ("Vaden") ("TT2"), and Defendant Andrew Eloy Lozano ("Lozano") ("TT3"). (Ex. E at 00221; 00317–331, ECF Nos. 1198-3, 1198-4). The application was supported by an affidavit from Special Agent Neal, Department Homeland Security. (*Id.* at 00247). The target subjects included defendants Palafox and Lozano, along with several other non-parties. (*Id.* at 00247–48). Special Agent Neal stated that probable cause existed to believe

that the aforementioned individuals had committed, or were committing, narcotics-related crimes for the benefit of the Vagos. (*Id.* at 00258–61).

### 5. September 2010 Wiretap Application and Order

An order extending the August 2010 wiretap was approved by the Central District of California on September 28, 2010. (Ex. F at 00332; 00439–53, ECF Nos. 1198-5, 1198-6). This wiretap application sought to intercept calls to and from phones operated by Vaden, Lozano, Robert Laguardia ("TT4"), and Defendant John Siemer ("Siemer") ("TT5"). (*Id.* at 00358–59). The following defendants were listed as target subjects: Palafox, Lozano, and Siemer. (*Id.* at 00364, 00370). The affidavit included information learned from the August 2010 wiretap, and additional updates, including the arrest of Ayala, altercations with rival gangs, and plans to retaliate against a rival gang. (*See, e.g.*, *id.* at 00376–77).

Palafox now moves to suppress evidence obtained from the wiretaps and requests a *Franks* hearing. (Mot. to Suppress ("Mot.") at *i–ii*, ECF No. 1198). The Court held hearings as to the instant Motion to Suppress on March 5, 2019, (ECF No. 1537), and on April 4, 2019, (ECF No. 1560).

## II. <u>DISCUSSION</u>

### A. Standing

Palafox, and the other defendants who filed joinders to Palafox's Motion, assert that they have standing to suppress the evidence derived from the Government's 12 wiretap applications. (Mot. 18:3–19:13, ECF No. 1198); (Min. Order, ECF No. 1476) (granting motions for joinder to Palafox's Motion to Suppress). The Government concedes that some of the defendants have standing, but that their standing correlates to each defendant's status as either the user of the target telephone, an intercepted user, or as a target subject. (Resp. 14:12–16, ECF No. 1342). However, the Government argues that because no defendant was identified as a user of a target telephone, an intercepted user, or a target subject in the May 2010 wiretap, no one has standing

to challenge the application. (*Id.* 15:19–22).  Additionally, the Government contends that only Lozano has standing to challenge the June and July 2010 wiretap applications because he was the only defendant that was intercepted pursuant to those wiretaps. (*See id.* 15:12, 15:19–22).

Palafox replies that co-defendant Lozano has joined the Motion to Suppress, and that the Court should issue a ruling on the Motion based upon Lozano's standing. [6] (Reply 3:10–13, ECF No. 1361); (Lozano's Mot. for Joinder, ECF No. 1243).

Standing is governed by 18 U.S.C. § 2518(10)(a), which provides that

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that
> (i) the communication was unlawfully intercepted;
> (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> (iii) the interception was not made in conformity with the order of authorization or approval.

An aggrieved person is one that was a party to the intercepted wire, "or a person against whom the interception was directed." 18 U.S.C. § 2510(11).  The rule of standing under Section 2518(10)(a) is no broader than that of the Fourth Amendment. *See United States v. Taketa*, 923 F.2d 665, 676 (9th Cir. 1991) ("The Supreme Court has read the statutory language to extend standing no further than the normal reach of fourth amendment standing.") (*citing Alderman v. United States*, 394 U.S. 165, 175–76 (1969)).  A defendant may move to suppress wiretap evidence if his privacy was "actually invaded." *United States v. King*, 478 F.2d 494,

---

[6] In his Reply, and at the March 5, 2019 hearing, Palafox argued that he too had standing to challenge the state wiretap investigation, including the June and July 2010 wiretap applications because the language of those applications "implicates the existence of 'unknown' target subjects," and he was one such unnamed subject as the international president of the Vagos. (Reply 3:13–4:3); (Mins. Proceedings, ECF No. 1537).  However, during the April 4, 2019 hearing, the Court rejected Palafox's argument and held that Palafox does not have standing to challenge the May, June, or July 2010 wiretap applications because he is not an "aggrieved person" under 18 U.S.C. § 2510(11). (Mins. Proceedings, ECF No. 1560).  Because the Court has already addressed Palafox's arguments as to standing, the Court need not address them again here.

506 (9th Cir. 1973).  An invasion of privacy occurs when the defendant is either a participant in the call or the interception occurred on the defendant's premises.  *Id.*  A defendant does not have standing where he is only a subject of the conversation.  *See generally Light v. United States*, 529 F.2d 94 (9th Cir. 1976).

Here, no defendant was a user of a target telephone, an intercepted user, or a target subject of the May 2010 wiretap, and thus, there is no aggrieved person who may move to suppress its contents.  As to the June and July 2010 wiretap applications, Lozano was the only defendant identified as an intercepted user.  Thus, only Lozano has standing to challenge the June and July 2010 wiretaps.  Given that Lozano has joined the Motion, the Court will address whether said wiretaps must be suppressed.

Regarding the remaining wiretap authorizations, the Court finds that the following defendants have standing to challenge one or more of the wiretap orders because they were either an intercepted user, user of a target telephone, or target subject—and joined Palafox's Motion to Suppress. (Min. Order, ECF No. 1476); (*see* Resp. 15:1–19).

| August 2010 | Palafox, Lozano |
|---|---|
| September 2010 | Palafox, Lozano, Juarez |
| October 2010 | Palafox, Lozano, Campos, Juarez |
| November 2010 | Palafox, Lozano, Campos, Juarez |
| December 2010 | Palafox, Lozano, Campos, Juarez, Gonzalez, Voll |
| January 2011 | Palafox, Lozano, Gonzalez, Juarez |
| March 2011 | Palafox, Lozano, Juarez |
| April 1, 2011 | Palafox, Lozano, Juarez |
| April 29, 2011 | Palafox, Lozano, Campos, Juarez |

*///*

**B. State and Federal Wiretaps**

　　**1. Legal Standard**

In evaluating the validity of a wiretap issued in state court, the Court applies both federal law and state law. Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") governs the use of electronic surveillance. 18 U.S.C. § 2516(2) governs the validity of state-issued wiretap orders, like those found in the present case. 18 U.S.C. §§ 2515 and 2518 address when wiretap evidence must be suppressed and how and when a defendant may move to suppress such wiretap evidence.

The federal wiretap statute permits states to authorize the interception of wire communications. *See* 18 U.S.C. § 2516(2). State laws must meet the minimum standards of Title III. Section 2516(2) states, in pertinent part, that:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter . . .

18 U.S.C. § 2516(2).

Under Section 2515, "if the disclosure of [intercepted communications] would be in violation of this chapter," the communications must be suppressed upon a motion properly made under Section 2518(10)(a). *See United States v. Giordano*, 416 U.S. 505, 508 (1974). Section 2518 provides three bases for suppression, including suppression of the wiretap evidence on the grounds that it was "unlawfully intercepted." Here, Palafox contends that the communications were unlawfully intercepted pursuant to invalid wiretap orders. (*See* Mot. 27:1–2).

Sections 2515, 2516(2), and 2518 do not address what law governs admissibility of evidence obtained under state law procedures; Section 2516(2) requires only that the wiretap

order be obtained in conformity with state law.  The Ninth Circuit has held that federal law

governs the admissibility of wiretap evidence.  "Evidence obtained pursuant to a state court

wiretap authorization is not subject to suppression in federal court if that evidence was obtained

in compliance with federal law." *United States v. Homick*, 964 F.2d 899, 903 (9th Cir. 1992)

(citing *United States v. Chavez–Vernaza*, 844 F.2d 1368, 1372 (9th Cir. 1987)).  Therefore,

although the validity of the wiretap is governed by both federal and state law, it will only be

suppressed if it was obtained in violation of federal law. *Id.*; *see also Chavez–Vernaza*, 844

F.2d at 1373 ("[W]e have consistently stated that the admissibility of evidence obtained in

violation of state law turns on whether a federal right has been infringed, not on the presence or

absence of federal involvement at the evidence-gathering stage of an investigation"); *United

States v. Hall*, 543 F.2d 1229, 1235 (9th Cir. 1976) ("[W]iretap evidence obtained in violation

of neither the Constitution nor federal law is admissible in federal courts, even though obtained

in violation of state law . . . ").  Accordingly, the challenged wiretap applications—both state

and federal—are subject to the federal law.

The authority conferred under Title III for law enforcement agencies to conduct

electronic surveillance of suspected criminal activities "is not a blank check." *United States v.

Garcia–Villalba*, 585 F.3d 1223, 1227 (9th Cir. 2009).  The Government must generally satisfy

two requirements before a district court will issue a wiretap order—probable cause and

necessity. *Id.*

### (a)     *Probable Cause*

Probable cause under the Fourth Amendment exists "where the facts and circumstances

within the affiant's knowledge, and of which he has reasonably trustworthy information, are

sufficient unto themselves to warrant a man of reasonable caution to believe that an offense has

been or is being committed." *Berger v. New York*, 388 U.S. 41, 55 (1967).  Under 18 U.S.C.

§ 2518(3) courts may authorize wiretaps if an applicant shows probable cause that: an

individual is committing, has committed, or is about to commit specified offenses; communications relevant to that offense will be intercepted through the wiretap; and the individual who is the focus of the wiretap investigation will use the tapped phone. 18 U.S.C. § 2518(3)(a), (b), (d). Courts will uphold a wiretap if, looking only at the four corners of the application, "there is a 'substantial basis' for these findings of probable cause." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995) (citations omitted).

In *Illinois v. Gates*, the Supreme Court noted that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). In adopting the totality of the circumstances test, the Supreme Court repeatedly emphasized that it was rejecting any rigid or technical approach to the determination of probable cause. *Id.* at 230–38.

> When applying the totality of the circumstances test,
>
> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*Id.* at 238.

The task of a court reviewing a probable cause determination made by an authorizing judge is simply to ensure that the issuing judge or magistrate had a substantial basis for concluding that probable cause existed. *Id.* at 235. A finding of probable cause by the issuing judge or magistrate must be upheld unless it is clearly erroneous. *United States v. McQuisten*, 795 F.2d 858, 861 (9th Cir. 1986). Additionally, the Supreme Court has indicated that while determinations of whether an affidavit demonstrates the existence of probable cause will often

be difficult, the resolution of doubtful or marginal cases should be determined largely by the preference to be accorded to warrants. *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984).

### *(b)    Necessity*

To demonstrate necessity, the wiretap application must contain:

[A] full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) except as provided in subsection (11), a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted[.]

18 U.S.C. § 2518(1)(b). The necessity requirement is not construed as a requirement that traditional techniques are useless, but that electronic surveillance may be needed to further the investigation. *See United States v. Shyrock*, 342 F.3d 948, 976 (9th Cir. 2003). In investigations of conspiracy, the Government has "considerable latitude" in wiretapping suspected members of that conspiracy. *United States v. McGuire*, 307 F.3d 1192, 1198 (9th Cir. 2002). If there are multiple wiretap applications, each application must, on its own, satisfy the necessity requirement. *See United States v. Carneiro*, 861 F.2d 1171, 1176 (9th Cir. 1988).

The Ninth Circuit provides a two-step approach in reviewing wiretap orders. *United States v. Rodriguez*, 851 F.3d 931, 937 (9th Cir. 2017). First, the district court "reviews de novo whether an application for a wiretap order is supported by a full and complete statement of the facts in compliance with 18 U.S.C. § 2518(1)(c)." *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008). Once the court determines that a full and complete statement was submitted, then the court reviews under an abuse of discretion standard that the issuing judge's decision that there was probable cause and necessity to issue the wiretap. *See United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001); *United States v. Brone*, 792 F.2d 1504, 1506

(9th Cir. 1986).  "[A] district court reviewing the validity of a wiretap order must examine the application to see if it contained material misstatements or omissions regarding the necessity of the wiretap." *Caneiro*, 861 F.2d at 1176.  In granting a wiretap extension, the judge must conduct the same findings that are necessary in the original wiretap order. 18 U.S.C. § 2518(5); *see also United States v. Giordano*, 416 U.S. 505, 530 (1974).

Here, Palafox asserts that the state wiretap orders and each of the nine federal wiretap orders fail to demonstrate necessity and probable cause. (Mot. at 27, 40).  Palafox's arguments as to the federal wiretaps focus only on the August and September 2010 wiretap applications, contending that they were unlawful, and therefore, tainted all subsequent wiretaps. (*Id.* at 40).

### 2.  Analysis

#### (a)    *May 2010 Wiretap Application*

Given that no defendant has standing to challenge the May 2010 wiretap order, the Court does not express an opinion as to probable cause or necessity.

#### (b)    *June 2010 Wiretap Application*

As discussed in Part II.A *supra*, only Lozano has standing to challenge the June 2010 wiretap application.  Defendant Lozano has joined in Palafox's Motion and incorporates the underlying points and authorities, stating that his arguments mirror those set forth by Palafox. (Mot. for Joinder at 2, ECF No. 1243).

The Court begins by conducting a de novo review of the statements in the wiretap application and affidavit purporting to show necessity under 18 U.S.C. § 2518(1)(c).  Based on the Court's de novo review, the Court finds that Sgt. Bennett's 59-page affidavit adequately described the use of various investigative techniques, why those techniques would not achieve all of the investigation's objectives, and why other techniques would be unlikely to succeed. The Court will now consider whether the June 2010 wiretap was necessary and supported by probable cause.

### i. Probable Cause

Palafox argues that the affidavit submitted in support of the June 2010 application failed to establish probable cause and lacked necessity. (Mot. 29:12). Specifically, he argues that Sgt. Bennett failed to link Ayala's criminal activity to the Vagos. (*Id.* 30:6–9). Palafox further argues that Sgt. Bennett did not assert that the intercepted calls related to drug-trafficking, which were referenced in the affidavit, were between Ayala and individuals connected to the Vagos. (*Id.* 30:1–9). Lastly, Palafox submits that Sgt. Bennett's analysis of some calls, including one referencing a "green derby," are vague, and that Sgt. Bennett used a self-serving interpretation to support the application. (*Id.* 30:22–32:12; Ex. C at 00085, ECF No. 1198-1).[7]

The Government concedes that some calls are unrelated to Vagos and Ayala, but argues that Palafox has downplayed several other calls which demonstrate a connection between drug trafficking and the Vagos organization. (Resp. 20:26–21:2). Moreover, the Government argues that the calls demonstrate that Ayala and Vagos members were engaged in violent and criminal activity. (*Id.* 21:20–22:23). Lastly, the Government asserts that Sgt. Bennett is permitted to rely on his own experiences to interpret coded language. (*Id.* 22:15–23).

Having reviewed the wiretap application, the Court finds that Sgt. Bennett made the requisite showing of probable cause. Sgt. Bennett stated in his affidavit that he believes that target subjects "are committing, have committed, or are about to commit" criminal street gang activity and conspiracy to commit murder. (Ex. C at 00074–75). In support of that belief, Sgt. Bennett detailed intercepted telephone conversations from Ayala's cellular phone, as a result of the May 2010 wiretap. These calls, given all of the circumstances, support a finding of

---

[7] Palafox also briefly argues—for the first time in his Reply—that because the state wiretaps were issued under California state law, and California Penal Code § 186.22(e)(1)–(33) "appears to allow" wiretaps for a broader category of criminal activity than Title III, "even if some (or all) of the state wiretaps were lawful, the collected evidence should be excluded from a federal trial *unless* such evidence would have been lawfully obtained through *federal* wiretaps." (Reply 2:15–3:4); (*see also* PowerPoint Slides, Ex. A, ECF No. 1560). However, Palafox fails to provide any further analysis. As such, the Court will not consider this argument.

probable cause. Palafox relies on select portions of conversations to support his position without assessing the totality of the circumstances, which is the standard the Court is required to apply. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). Further, the Government identified two calls on June 2, 2010 and June 3, 2010, where Ayala and a male identified as "Memo #2," discuss transporting narcotics from Mexico into the United States. (*Id.* at 00090–93). There, Ayala discusses the need to pay "Fred and Isaac" for their assistance in his plan. (*Id.* at 00092). Ayala distinctly describes the need to pay Fred and Isaac because "they are above him." (*Id.*). While the summary of the call does not explicitly describe "Fred" as "Fred Mendoza," the affidavit introduces a "Fred Mendoza" as "Target Subject 3," and as a Vagos chapter president. (*See id.* at 00069). Further, a "Fred Mendoza" is described later in the affidavit as "an admitted member of the Vagos." (*Id.* at 00095). Therefore, the issuing court could make a common-sense determination that the Fred referenced in the call is the same Fred Mendoza the Government identified as a Vagos chapter president.

Next, Palafox argues that some calls are vague and rely on Sgt. Bennett's self-serving assessment. (Mot. at 39). Specifically, Palafox takes issue with a conversation that occurred between Ayala and Mendoza, where Mendoza instructed Ayala to go "green derby" on an unidentified male. (Ex. C at 00085). Sgt. Bennett explained that green derby is gang vernacular for severely injuring another. (*Id.*). He further explained that Fred instructed Ayala to hurt the unidentified male mentioned in the conversation. (*Id.*). While Palafox disputes Sgt. Bennett's interpretation, an issuing judge may rely on law enforcement officials' professional experience in interpreting such representations. *See United States v. Beltran*, 11 Fed. App'x 786, 787 (9th Cir. 2001) (finding that when a law enforcement officer "submitted an affidavit in which he provided his interpretations of 'coded' conversations recorded by previous wiretaps, . . . the district court could . . . rely on those interpretations to find probable cause"); *see also United States v. Smith*, 118 F. Supp. 2d 1125, 1133 (D. Colo. 2000). Sgt. Bennett, a police officer for

the San Bernardino Police Department, has served as a sworn officer since 2002. (Ex. C at 00062). He is tasked with investigating drug trafficking organizations and has extensive experience as a narcotics investigator. (*Id.* at 00062–63). Further, Sgt. Bennett has experience investigating gangs and its members. (*Id.* at 00065). Therefore, the issuing judge could reasonably rely on Sgt. Bennett's interpretation of "green derby." (*See* Ex. C at 00085). Accordingly, this Court finds that the issuing judge had a substantial basis for concluding that probable cause existed, warranting the June 2010 wiretap.

### ii. Necessity

Palafox argues that law enforcement failed to demonstrate necessity for the June 2010 wiretap, and that completed investigative measures had already succeeded in establishing a case against Ayala. (Mot. 33:10–15). Accordingly, Palafox submits that traditional investigative tactics only failed because the Government could not establish that Ayala was acting for the benefit of the Vagos. (*Id.*). Palafox provides a number alternative investigative techniques available to law enforcement to meet the objectives of the wiretap. (*Id.* 33:15–34:7). The Government responds that the objectives of the wiretap extended beyond uncovering evidence of only Ayala and his narcotics activities. (Resp. 24:4–20).

The Court has reviewed the application and is satisfied that the affidavit demonstrated necessity. There is no requirement that law enforcement officials need to exhaust every conceivable alternative before obtaining a wiretap. *United States v. McGuire*, 307 F.3d 1192, 1196–97. Indeed, the purpose of the necessity requirement is to ensure that the tool of electronic surveillance is used "with restraint" and not as the "initial step in criminal investigations." *United States v. Giordano*, 416 U.S. 505, 515 (1974). Here, the Government has demonstrated that the wiretap was not the tool first used to investigate Ayala. Sgt. Bennett states that the wiretap is necessary for the Government's objectives "because normal investigative techniques have failed, appear reasonably likely to fail if tried, or are too

dangerous." (Ex. C at 00100). In support of this assertion, Sgt. Bennett includes a list of investigative techniques that were either used, or that were considered and why they were not reasonably likely to succeed. (*Id.* at 00100–01). For example, Sgt. Bennett states that interviewing the target subjects or their associates would produce insufficient truthful information as to the identities of the all the persons involved in the Vagos gang and would also have the effect of alerting the members of the conspiracy, thereby compromising the investigation. (*Id.* at 00101). Sgt. Bennett also states that the use of a confidential informant and undercover agent is unavailable given the close-knit structure of the gang. (*Id.* at 00101–02). He further provides a description of surveillance tactics used by law enforcement and the limitations imposed by excess surveillance. (*Id.* at 00102–06) (affiant stating that "excess random surveillance of a location could expose the identity of the officers and thereby compromise the investigation."). Controlled buys were inappropriate because law enforcement would be limited to collecting information only as to Ayala. (*Id.* at 00102). Sgt. Bennett also explained that surveillance had been successful, but produced limited results towards their objectives. (*Id.* at 00105). Thus, the Government properly demonstrated necessity, as the wiretap was not a first step and was needed to meet their objectives when other traditional techniques failed. Accordingly, the Court finds that the authorizing judge did not abuse his discretion in concluding that the wiretap was necessary to achieve the investigation's aims, and that law enforcement had pursued traditional investigative procedures.

### (c) *July 2010 Wiretap*

Next, Palafox moves to suppress information obtained from the July 2010 wiretap extension, arguing that the affidavit lacked necessity and probable cause. (Mot. at 34).

The Court first conducts a de novo review of the statements in the wiretap application and affidavit purporting to show necessity under 18 U.S.C. § 2518(1)(c). Based on this Court's de novo review, the Court concludes that the wiretap application and affidavit adequately

explain why the interception of wire communications was necessary, and that they contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous. The Court will now consider whether the July 2010 wiretap was necessary and supported by probable cause.

### i. Probable Cause

Palafox argues that the intercepted calls from the prior wiretap do not establish probable cause to warrant extending the wiretap. (Mot. 34:10–22). Specifically, Palafox argues that a number of the intercepted calls fail to demonstrate that Ayala engaged in narcotics distribution at the benefit of the Vagos, and that based on the calls, Ayala was at odds with the Vagos organization. (*Id.* at 34, 37).

First, Palafox disputes a conversation where Ayala discusses patches given to members for sex acts, and then remarks on another Vagos member known by the name of "Tata."[8] (*Id.* 35:3–14; Ex. D at 00175–176). During the conversation, Ayala remarked that Tata was a "funny name." (Ex. D at 00175). Palafox argues that this comment demonstrates that Ayala was unfamiliar with Palafox. (Mot. 35:8–11). Next, Palafox contests a conversation between Ayala and Jessie Valenzuela, where Ayala expressed frustration with a Vagos member that continued to associate with a man who had "pulled a shotgun on Ayala." (Mot. 35:15–36:8; *see also* Ex. D at 00157). Ayala then spoke to Mendoza about that same incident, upset that Mendoza permitted Vagos members to associate with the man that had pulled a gun on Ayala. (Ex. D at 00159). According to Palafox, the fact that Ayala displayed agitation during this conversation demonstrates a likelihood that Ayala was not engaged in criminal activity for the benefit of the Vagos. (Mot. 36:1–9).

---

[8] Tata would later be identified as Palafox, the alleged international president of the Vagos. (*See* Ex. F at 00364, ECF No. 1198-6).

Palafox also disputes a conversation between Ayala and "Fernanado," where the two discussed the issues they had with the Vagos organization, including having to pay dues, the early morning meetings, the lack of support from other members, and bail money owed to Ayala. (*Id.* 36:9–27; *see also* Ex. D at 00164–74). Fernando also complained that Ayala did not provide Fernando with "work," and Ayala replied that "Fred told him not to bring anyone else." (Ex. D at 00175). Palafox argues that this conversation demonstrates that Ayala was prohibited from bringing Vagos members into his drug-related activity. (Mot. 37:20–38:22). Lastly, Palafox submits that Sgt. Bennett included a misrepresentation in his affidavit, by stating that members had voted to retaliate against a rival gang, and that the "misrepresentation" contributed to the probable cause determination. (*Id.* 39:2–16).

The Government responds that Palafox's first disputed conversation, where Ayala references Tata, demonstrates that at the "very most" Ayala only knew Palafox by his nickname. (Resp. 30:6–15). The Government argues that the conversation concerning the shotgun incident should be viewed in the context of the entire call, where Ayla also expressed dismay that he is required to risk his freedom to retaliate for the stabbing of a prospective Vagos member but Vagos members are not offering him the same support. (*Id.* 28:7–25). Next, the Government argues that the conversation with Fernando demonstrates that some Vagos members, including Mendoza, were involved in Ayala's narcotics activities. (*Id.* 28:26–30:5). This is demonstrated by Fernando's repeated requests for Ayala to call Fernando first with "work" instead of Mendoza. (*See* Ex. D at 00171).

The Court has reviewed the affidavit and finds that Sgt. Bennett established probable cause to support the wiretap order. While Palafox cites to specific calls, and pieces of conversations that he believes negate the Government's view that Ayala acted on behalf of the Vagos, the Court must assess the totality of the circumstances. *Gates*, 462 U.S. at 238. The portions of the affidavit that Palafox references and uses as support in his argument reflect

snippets of entire telephone conversations.  For example, Palafox uses a selected portion of the conversation with Fernando to demonstrate that Vagos members were not involved in Ayala's activities, however, Fernando also complains that Ayala continues to call Mendoza, a known Vagos member, with work instead of Fernando. (*See* Ex. D at 00171).  The Court cannot view the selected portions of conversations identified by Palafox out of context.  Sgt. Bennett's affidavit and his interpretation of those conversations establishes a substantial basis for a finding of probable cause for a wiretap.

### ii. Necessity

Palafox summarily asserts that the July 2010 wiretap does not demonstrate necessity, but Palafox does not provide support for this argument. (Mot. 34:8–10).  As such, the Court finds this argument without merit.  Accordingly, the Court does not find that the issuing judge abused his discretion in deciding that there was probable cause and necessity to issue the wiretap. *See United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

### (d) August 2010 Wiretap

First, the Court conducts a de novo review of the statements in the wiretap application and affidavit purporting to show necessity under 18 U.S.C. § 2518(1)(c).  Based on the Court's de novo review, the Court concludes that the wiretap application and affidavit contain a full and complete statement of facts to support a necessity determination. *See* 18 U.S.C. § 2518(1)(c).

### i. Probable Cause

Palafox argues that the August 2010 federal wiretap lacked probable cause and impermissibly expanded the investigation from Ayala to include Vaden and Lozano. (Mot. 40:1–19).  Palafox does not offer additional support for this argument.  The Government responds that the affidavit contained substantial information that established probable cause. (Resp. 34:9–17).  Palafox replies that intercepted conversations do not establish probable cause linking other Vagos members to Ayala's narcotics activities. (Reply 14:3–18).

The Court has reviewed the affidavit and finds that the affidavit demonstrated a showing of probable cause. The affidavit states that Palafox, Vaden, Lozano, and Mendoza, among others, have committed and are continuing to commit crimes enumerated in Section 2516, including RICO violations and narcotics trafficking. (Ex. E at 00247–48). Special Agent Neal's affidavit then includes a summary of the investigation and the evidence obtained from the state wiretap. (Ex. E at 00261–68). Further, the affidavit references additional intercepted calls that establish probable cause. For example, there is an intercepted call between Vaden and Ayala, where Ayala states that he is calling with Fred the "P" to discuss patches. (*Id.* at 00269). Fred Mendoza is the alleged president of the Vagos San Bernardino chapter. (*Id.*). Other calls between Ayala and Vaden include discussions regarding an upcoming Vagos leadership meeting, and the patches the organization uses to denote membership. (*Id.* at 00270–72). As to Lozano, Special Agent Neal documents conversations where Ayala and Lozano discuss attending a Vagos leadership meeting. (*Id.* at 00272–74). Special Agent Neal also includes a reference to an attempted robbery by Ayala, Mendoza, and three others: Rodriguez, Aguilar, and Aldridge. The five intended on robbing a narcotics supplier of ten kilograms of drugs, but both Ayala and Aldridge were apprehended by police before the robbery could take place. (*Id.* at 00274–75). Thus, having reviewed the affidavit, the Court finds that there was probable cause to support a finding that the target subjects committed, or were committing a Section 2516 enumerated crime.

Palafox asserts that Special Agent Neal broadly and unreasonably defined the objectives of the investigation and thereby manufactured necessity. (Mot. 42:11–24). Palafox directs the Court to a section of the application where the affiant states that the wiretap is necessary to discover "[t]he full scope of the illegal activities conducted by the Vagos [organization] . . . ." (Ex. E. at 00281); (Ex. F at 00400). The affiant further states that the wiretap is necessary to obtain "[e]vidence . . . proving beyond a reasonable doubt . . . the alleged violations . . . ." (Ex.

E. at 00282); (Ex. F at 00401). According to Palafox, these objectives would render any investigative technique insufficient. (Mot. 44:2–18).

Palafox relies on *United States v. Blackmon*, a case where the Ninth Circuit granted a motion to suppress a wiretap due to the Government's broad and generalized investigative objectives. *Blackmon*, 273 F.3d 1204, 1211 (9th Cir. 2001). Further, the affidavit contained boilerplate conclusions concerning necessity that would be true of any investigation. *Id.* at 1210. However, the Ninth Circuit has recognized the difficult nature of investigating conspiracies by large complex organizations and the unknown identities of its members. *See e.g.*, *United States v. Shryock*, 342 F.3d 948, 976 (9th Cir. 2003); *see also McGuire*, 307 F.3d at 1198. As such, the Ninth Circuit affords the investigation of such organizations considerable leeway. *McGuire*, 307 F.3d at 1198. Further, the Ninth Circuit has continuously approved broad investigative goals in conspiracy cases. *See United States v. Canales Gomez*, 358 F.3d 1221, 1224 (9th Cir. 2004) (approving a wiretap order in a conspiracy investigation where the objectives were to discover "full scope of the massive conspiracy under investigation," and to "obtain direct evidence that will convince a jury beyond a reasonable doubt of its existence"); *see also United States v. Bennett*, 219 F.3d 1117, 1121 n.3 (9th Cir. 2000) (noting that the Ninth Circuit has "consistently upheld similar wiretap applications seeking to discover major buyers, suppliers, and conspiracy members"); *United States v. Brone*, 792 F.2d 1504, 1505–06 (9th Cir. 1988) (finding that the district court did not abuse its discretion in authorizing a wiretap to "enable the agents to uncover the source of [the defendant's] narcotics or the modus operandi of the alleged conspiracy."). Thus, given the complex nature of the Vagos investigation, the Court does not find that the affidavit's goals are so broad as to render any investigative technique useless.

Palafox next asserts that the Government failed to diligently pursue traditional investigative procedures such as confidential sources, consensual recordings, search warrants

and arrests, interviews or offers of immunity, controlled purchases, and undercover agents before seeking the wiretap. (Mot. 44:19–21). But Special Agent Neal's affidavit provided an account of the investigative tactics used by law enforcement and why each technique failed or would not achieve the goals of the investigation, thereby necessitating the wiretap. These tactics included: confidential informants and undercover officers; consensual recordings; physical and electronic surveillance; search warrants; interviews/grand jury subpoenas/immunity, trash searches, mail covers, pen registers/trap and trace devices, and financial investigation. (Ex. E at 00284–311).

(1) Confidential Informants

Palafox argues that the Government failed to use, and failed to consider using, the three confidential sources, CS-1, CS-2, and CS-3, described in the affidavit.[9] (*Id.* 46:3–53:14); (*see also* Ex. E at 00284–89). As to CS-1, Palafox argues that the Government's conclusion that CS-1 would not expose the full-scope of the criminal operations of Vagos is unreasonable. (Mot. 47:5–23). Palafox contends that since the investigation rested on Ayala's drug activities, utilizing CS-1 was far superior than obtaining wiretaps of suspected Vagos members. (*Id.*). Palafox next claims that law enforcement failed to resolve the question of CS-2's credibility and thus, committed a material misrepresentation to the issuing judge. (*Id.* 48:7–51:7). Lastly,

---

[9] CS-1 is not a member of the Vagos organization, but was able to introduce an undercover agent to Ayala to conduct "drug transactions." (Ex. E at 00284). Law enforcement concluded that information from CS-1 could not be used because CS-1 is not a Vagos member and he would not be trusted with information regarding the inner workings of the organization. (*Id.*). CS-2, a former "full patched member of the Vagos [organization]," is likened to "a former employee of a company, where he/she may recognize the managers of the company, but he/she does not have direct dealings of them." (*Id.* at 00285–86). Special Agent Neal also indicated that law enforcement was in the process of determining CS-2's credibility, and that if he is credible then they may attempt to utilize him to infiltrate CS-2's former chapter. (*Id.* at 00286). Special Agent Neal expressed doubt that CS-2 could be useful because if CS-2 approaches leaders in the organization, then he would be viewed with suspicion in light of pending charges against CS-2. (*Id.*). Lastly, Special Agent Neal discussed utilizing CS-3, a long-standing associate of the Vagos organization, as a source and possible Vagos leader, but noted potential safety and legal concerns with this tactic. (*Id.* 00286–89).

Palafox challenges the Government's claim that CS-3 would fail to meet law enforcement's objectives. (*Id.* 51:8–53:14).

The Government responds that Special Agent Neal properly explained the utility limitations posed by each informant. (*See* Resp. 35:5–43:23). As to the issue of material misrepresentation, the Government argues that while the first federal affidavit does not provide information as to CS-2's credibility, the affidavit for the fifth federal wiretap authorization cures that deficiency. (*Id.* 38:8–39:7).

In reviewing Special Agent Neal 's 73-page affidavit, there is specific detail as to why each confidential source was unable or unlikely to succeed in achieving the objectives of the investigation. The Court finds no reason not to rely on Special Agent Neal's assertions concerning the utility limitations of each informant, especially given Special Agent Neal's experience and training. Special Agent Neal, an agent of the Department of Homeland Security, has served in his position since March 2003 and has extensive training and experience in the use of wiretaps, gang enforcement, violent crimes, narcotics distribution and transportation. (*See* Ex. E at 00243–46). Further, the Ninth Circuit has held that law enforcement is not tasked with exhausting every conceivable alternative before obtaining wiretap authorization. *See, e.g.*, *Rivera*, 527 F.3d at 902; *Canales Gomez*, 358 F.3d at 1225–26. Thus, it is not necessary for the Government to first utilize each confidential source before seeking wiretap authorization. Lastly, the Court does not construe the Government's contention that it was in the process of determining CS-2's credibility as a misrepresentation. The Government has demonstrated that as the investigation progressed, information relating to CS-2 was updated in the fifth and then sixth federal affidavits. (Resp. 38:8–39:7).

(2) Consensual Recordings

Palafox argues that Special Agent Neal could have utilized consensual recordings, and that Special Agent Neal applied the same utility limitations here as discussed in the confidential

sources section. (Mot. 53:15–54:7). The Government counters that Special Agent Neal explained that consensual recordings were not a useful technique. (Resp. 44:23–45:5).

The Court agrees with the Government. Consensual recordings are recorded conversations of an undercover agent or an informant. (Ex. E at 00292). The Government explained the utility limitations with confidential informants and the difficulties in using an undercover agent to infiltrate the organization. (*Id.*). Further, Special Agent Neal stated that the content of any such recording would be subject to the same limitations as informants and undercover agents, and that its use would not allow agents to "dismantle" the Vagos organization. (*Id.* at 00293).

(3) Search Warrants

Next Palafox asserts that Special Agent Neal should have continued to utilize search warrants to produce relevant information to the investigation. (Mot. 54:8–55:2). He also challenges Special Agent Neal's assertion that the use of search warrants on its own would not be successful. (*Id.*). The Government responds citing the affidavit wherein Special Agent Neal contends that search warrants would be used as deemed appropriate, and that search warrants alone could not accomplish the goals of the investigation. (Resp. 45:14–46:2).

The Government is not required to exhaust every single conceivable alternative before seeking a wiretap. *See, e.g.*, *Rivera*, 527 F.3d at 902; *Canales Gomez*, 358 F.3d at 1225–26.

> [T]he statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope.

*United States v. Baker*, 589 F.2d 1008, 1013 (9th Cir. 1979). Special Agent Neal's affidavit states that law enforcement would continue to use this technique when deemed appropriate.

(Ex. E at 00301) ("[A]dditional search warrants are expected to be used at times law enforcement deems appropriate.").

### (4) Interviews or Offers of Immunity

Palafox submits that Special Agent Neal failed to pursue the use of interviews with confidential sources, and that this technique is successful when actually employed by law enforcement. (Mot. 55:3–56:1.)  The Government responds citing to Special Agent Neal's contentions regarding the limitations of this investigative technique. (Resp. 46:3–15).

Here, Special Agent Neal states in his affidavit that interviewing target subjects would not achieve the goals of the investigation, because doing so "would do nothing more than alert [the target subjects] and other members of the organization of the greater law enforcement investigation." (Ex. E at 00304.)  As noted above, law enforcement is not required to exhaust alternative investigative techniques before seeking a wiretap.

### (5) Controlled Purchases

Palafox next offers that the law enforcement should have used controlled purchases before seeking the wiretap. (Mot. 56:20–57:6.)  While Special Agent Neal did not include a discussion of the limitations in utilizing controlled purchases in the necessity section of his affidavit, the Court, again, reiterates that the Government need not first utilize every conceivable alternative before seeking a wiretap.  Thus, there is no requirement that law enforcement exhaust the use of controlled buys to meet their investigative objectives.

Having reviewed the parties' arguments and the August 2010 affidavit, the Court finds that the Government demonstrated necessity in securing the August 2010 wiretap order. Accordingly, the Court will not suppress evidence obtained from this wiretap.

### *(e)    September 2010 Wiretap*

Palafox contests the validity of the September 2010 wiretap extension, arguing that the affidavit failed to demonstrate necessity.  First, the Court has conducted a de novo review of

the statements in the wiretap application and finds that Special Agent Neal's affidavit contains a full and complete statement of facts to support a necessity determination. *See* 18 U.S.C. § 2518(1)(c). The Court will now consider Palafox's necessity argument.

### i. Necessity

Palafox asserts the same necessity arguments against the September 2010 application as raised against the August 2010 wiretap application. To preserve judicial economy, the Court will not fully address each of the investigative methods used by law enforcement and why each method would have failed to achieve the goals of the investigation, thereby necessitating the wiretap. Palafox argues that the September 2010 wiretap extension contains language identical to the August 2010 wiretap when discussing CS-2. Palafox also submits that Special Agent Neal's statements concerning CS-3 negate necessity of the wiretap, and that Special Agent Neal failed to disclose information concerning CS-4's identity. Palafox's arguments include reference to wiretaps after the September 2010, but he provides no additional points and authorities. (*See* Mot. 57:17–58:4, 59:1–13). Thus, the Court will not consider those cursory arguments.

### (1) CS-2

Palafox argues that Special Agent Neal's contentions regarding CS-2 in the September 2010 wiretap, stating that law enforcement was in the process of corroborating CS-2's reliability, are a "word-for-word" repeat of the August 2010 wiretap, and that Special Agent Neal repeats this section throughout multiple extension applications. (Mot. 49:23–50:13). Palafox claims that in doing so, Special Agent Neal "made material misrepresentations and misled the court." (*Id.* 49:22–27). The Government responds that although the applications contain similar language, they are not impermissible carbon copies of one another. (Resp. 38:16–39:7).

The Court will not assess affidavits following the September 2010 extension, as Palafox has not submitted points and authorities as to those applications, but the Court does find that the September 2010 application is not an impermissible carbon copy of the August 2010 application. The Ninth Circuit in *Blackmon* found that an application "which is nearly a carbon copy of a previous application for a different suspect, contains material misstatements and omissions regarding the necessity of a wiretap and . . . purged of [those statements], the application contains only generalized statements that would be true of any narcotics investigation," is an insufficient application. *Blackmon*, 273 F.3d at 1208. First, Palafox has not presented any supporting evidence showing that Special Agent Neal's statements regarding corroborating CS-2's reliability were false. Second, the wiretap statute does not require originality in each wiretap application. However, the statute does require that the affidavit provide the facts and circumstances in the case. *See* 18 U.S.C. § 2518(1)(b). Specificity of the facts in the case prevents law enforcement from asserting "general allegations about classes of cases and thereby sidestepping the requirement that there be necessity in the particular investigation in which a wiretap is sought." *United States v. Ippolito*, 774 F.2d 1482, 1486 (9th Cir. 1985). Special Agent Neal's affidavit does not raise the concerns addressed in the *Ippolito*, as Special Agent Neal is not stating general allegations that may be true of a class of cases. The affidavit states what is true of CS-2 in this case. *See id.*

(2) CS-3

Palafox argues that CS-3 provided law enforcement useful information as reflected in the wiretap affidavit, and thus, negated the Government's argument of necessity. (*See* Mot. 52:7–53:14). The Government responds that the use of CS-3 only had limited access to insider Vagos information due to the structure of the organization. (Resp. 39:25–40:5). Further, the Government states that investigations into conspiracies are permitted considerable leeway. (*Id.* 40:21–25). Palafox replies that the Government did not have evidence of a vast conspiracy "so

CS-3's ability or inability [to] single-handedly bring down something which there was no reason to believe existed is irrelevant." (Reply 22:14–23:21).

While CS-3 appeared to be a useful source of information in obtaining the September 2010 wiretap, Special Agent Neal also expressed the limitations of using CS-3 to achieve the objectives of the wiretap.[10] Special Agent Neal indicated that it would take time before the Vagos organization put CS-3 in a position of trust, and then raised concerns with the Government effectively promoting crime by allowing a source to become a chapter president in a criminal organization. (Ex. E at 00407–08). Further, CS-3 would only be privy to information in his respective chapter. (*Id.* at 00408). Special Agent Neal claimed that C3-3 would be able to attend presidential meetings, but that a wiretap would still be necessary to corroborate the information. (*Id.* at 00409). Therefore, the use of CS-3 did not prevent the Government from obtaining a wiretap. Further, there was an active and ongoing investigation into the alleged conspiracy. As such, law enforcement was in the process of gathering evidence. The Government has "considerable latitude" in wiretapping suspected members of a conspiracy and investigating the Vagos organization was indeed one of Special Agent Neal's objectives. *McGuire*, 307 F.3d at 1198.

### (3) CS-4

Palafox next argues that necessity for the wiretap ceased when Ayala, identified as CS-4 in Special Agent Neal's affidavit, became a Government cooperator. (Mot. 58:4–27). Palafox submits that once Ayala cooperated, law enforcement could have interviewed him to gather information, used consensually-recorded conversations, informants, and other investigative methods. (*Id.*). The Government responds that Special Agent Neal's affidavit states that the investigation "was larger than Ayala," and that other investigative methods had limitations in

---

[10] CS-3 was a "cooperating defendant in a pending federal criminal case" and a Vagos associate, who was offered a presidential position within the organization. (Ex. F at 00406).

accomplishing the investigation's objectives. (Resp. 43:10–17). Palafox replies that the investigation was centered on Ayala and that the Government failed to utilize Ayala as an investigative tactic. (Reply 24:5–23).

The Court is not persuaded by Palafox's arguments. First, Special Agent Neal's affidavit stated that one of the objectives of the investigation was to discover "[t]he full scope of the illegal activities conducted by the Vagos [organization], a criminal street gang . . . ." (Ex. F at 00400). Therefore, the investigation extended beyond Ayala's narcotics activities. Second, the Ninth Circuit affords considerable latitude to the investigation of conspiracies, such as this one. *See McGuire*, 307 F.3d at 1198. And in the course of such an investigation, law enforcement is not required to first utilize every conceivable alternative before seeking a wiretap. *See, e.g.*, *Rivera*, 527 F.3d at 902; *Canales Gomez*, 358 F.3d at 1225–26. Special Agent Neal has provided in his affidavit a summary of the investigative tactics utilized by law enforcement in conjunction with seeking the wiretap extension. (Ex. F at 00403–33). These tactics included consensual recordings, physical and electronic surveillance, pen registers, and financial investigations. (*Id.*). Further, Special Agent Neal described the limitations of other investigative techniques including interviews, grants of immunity, grand jury subpoenas, and search warrants. (*Id.*). Lastly, Palafox has not cited any case law limiting which investigative tactics law enforcement may use during certain points in an investigation. Given that the Government could not have fulfilled the wiretap's objectives only using CS-4 as a confidential source and cooperator, the Court finds that the wiretap was necessary to fulfill the investigative objectives.

Having reviewed the September 2010 wiretap extension application and affidavit, the Court finds that the Government demonstrated necessity in obtaining the wiretap extension. Given that the Court has found both the August 2010 wiretap authorization and the September 2010 wiretap extension lawful, Palafox's argument that all subsequent extensions are tainted

"fruit of the poisonous tree" is without merit. Accordingly, to the extent Palafox's Motion

seeks to suppress the evidence obtained through wiretaps, Palafox's Motion is **DENIED**.

### C. *Franks* Hearing

Palafox moves for a hearing pursuant to *Franks v. Delaware*, arguing that the affidavits

in support of the wiretaps contained false statements and omissions, and that probable cause

ceases when the affidavit is purged of those false statements. (Mot. 66:9–11). Palafox argues

that Special Agent Neal made material misrepresentations and omissions in his affidavit to

obtain the federal wiretap authorizations. Specifically, Palafox argues that Special Agent

Neal's affidavit (1) falsely asserts that the Vagos voted to retaliate against a rival gang, (2) that

Special Agent Neal failed to disclose in the August 2010 affidavit that Ayala was disgruntled

and isolated from Vagos, and (3) that Special Agent Neal failed to disclose in the September

2010 that Ayala served as a confidential informant. (*Id.* 60:23–66:8). Palafox also asserts that

once the false material information is removed from the affidavit, there is no probable cause to

support the August 2010 wiretap. (*Id.* 66:9–11).

In response, the Government argues that Palafox has failed to make a substantial

showing of false statements or material omissions. (Resp. 48:7–49:5). The Government

submits that there are several calls that, combined, serve as reasonable basis to believe a vote to

retaliate had occurred. (*Id.* 49:6–50:21). Next the Government argues that while Ayala was

indeed disgruntled, he continued to conduct Vagos business. (*Id.* 50:22–52:10). Lastly, the

Government argues that Special Agent Neal did disclose Ayala as an informant through an *in

camera* affidavit filed the same day as the application. (*Id.* 52:11–16); (Ex. 1 to Resp., ECF No.

1342-1).

Affidavits in support of a warrant are presumed valid. *See Franks v. Delaware*, 438 U.S.

154, 171 (1978). Only once a defendant makes a substantial preliminary showing that (1) the

affidavit in support of the warrant contains intentional or reckless false statements and that (2)

the affidavit absent of the its falsities would not be sufficient to support a finding of probable cause, may he be entitled to a hearing on those issues. *See id.* at 155–56; *see also United States v. Martinez-Garcia*, 397 F.3d 1205, 1215 (9th Cir. 2005). Intentional or reckless omissions may also provide grounds for a *Franks* hearing. *United States v. Jawara*, 474 F.3d 565, 582 (9th Cir. 2007). While the defendant need not provide "clear proof" of the omission, the defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. Souffront*, 338 F.3d 809, 822–23 (7th Cir. 2003); *see also United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985).

The Court has reviewed the parties' arguments and the affidavits and finds that Palafox has not satisfied his burden in making a substantial preliminary showing. Further, the Court finds that the alleged omissions and false statements were not material. First, while the affidavit does not contain a conversation that specifically references a vote to retaliate against the Hells Angels, Special Agent Neal never asserted that any one call reflected a vote to retaliate. (*See* Ex. D at 00264) (stating that "officers discovered through intercepted calls on Target Telephone #1, that the Vagos had voted to retaliate against the Hells Angels for the murder of the Vagos 'prospect' and the stabbing of the full patched Vagos member."). Second, Palafox continues to rely on only favorable portions of intercepted conversations to support his arguments. The Court noted above that the conversation between Ayala and Fernando, when read as whole, support the theory that Vagos members were involved in Ayala's drug operation. (*See* Ex. D at 00164–74). Thus, the Court is not convinced that although Ayala was disgruntled, he had ceased to participate in Vagos activities, as intercepted calls demonstrate that he continued to be involved in Vagos business. (*See* Ex. E at 00272–74) (indicating that Ayala continued to discuss Vagos meetings and business).

Lastly, the Court turns to Palafox's contentions that the September 2010 wiretap application contained a material omission as to CS-4. The Government submitted, in connection with its wiretap application, an additional affidavit for *in camera* review. (Ex. 1 to Resp.). The affidavit was not submitted for the purpose of necessity or for probable cause, but only clarified information already stated in the wiretap affidavit. (*Id.* at 3). The affidavit sought to protect CS-4's identity, as exposure could potentially lead to serious harm. (*Id.* at 3–4). Palafox argues that such a supplement was impermissible. First, the additional affidavit was submitted in conjunction with the wiretap application produced in discovery. Therefore, the issuing court considered the additional information at the time the wiretap order was issued, and no material omission occurred. Second, Palafox argues that there was a material omission simply because CS-4's identity was not stated in the affidavit produced in discovery. This argument is not supported by *Franks*, which seeks to rid affidavits of "deliberate falsehood" or a "reckless disregard of the truth." *Franks*, 438 U.S. at 171. The Government's application contained neither, as all of the information was presented to the issuing judge. Further, even if Special Agent Neal wrongly omitted the identity of CS-4 in the discovery-produced affidavit, the affidavit with the "omitted" information would not have negated the finding of necessity by the issuing judge as the "omitted" information was already considered when the wiretap was issued. Or, otherwise stated, no omission occurred. Accordingly, the Court finds that Palafox is not entitled to a *Franks* hearing.

### D. Gonzalez's Motion for Leave

Gonzalez moves for leave to file or join a wiretap suppression motion for lack of necessity under 18 U.S.C. §§ 2518(1)(c) and 2518(3)(c). (Mot. for Leave 1:20–26, ECF No. 987). Gonzalez submits that although he was not a target of a wiretap, he was an aggrieved person and thus has standing. (*Id.*). Gonzalez has also joined, (ECF No. 1263), Palafox's Motion to Suppress, (ECF No. 1198). Defendants Perez, Coleman, Garcia, Neddenriep, Voll,

Juarez, and Davisson all move to join Gonzalez's Motion for Leave, and yet, only Neddenriep has not filed or joined a motion to suppress a wiretap. (ECF Nos. 994, 1018, 1023, 1029, 1079, 1087, 1111). Nonetheless, the Court **GRANTS** the Motions for Joinder and Gonzalez's Motion for Leave. Given that Gonzalez has joined Palafox's Motion to Suppress (ECF No. 1198), Gonzalez may file a separate motion to suppress to the extent that the legal arguments do not overlap with those raised in Palafox's Motion. Gonzalez shall have 14 days from the entry of this Order to file a motion to suppress.

**III.    CONCLUSION**

     **IT IS HEREBY ORDERED** that Palafox's Motion to Suppress Evidence Obtained by Unlawful Wiretaps, (ECF No. 1198), is **DENIED**.

     **IT IS FURTHER ORDERED** that the Government's Motion to Strike, (ECF No. 1377), is **GRANTED**, and Garcia's Motion for Joinder to Palafox's Reply, (ECF No. 1367), is **STRIKEN**.

     **IT IS FURTHER ORDERED** that the Government's Motion for Leave to File Excess Pages, (ECF No. 1338), is **GRANTED**.

     **IT IS FURTHER ORDERED** that Palafox's Motion for Leave to File Excess Pages, (ECF No. 1360), is **GRANTED**.

     **IT IS FURTHER ORDERED** that Gonzalez's Motion for Leave to Join or File a Wiretap Suppression Motion for Lack of Necessity, (ECF No. 987), is **GRANTED**, consistent with the foregoing.

///

///

**IT IS FURTHER ORDERED** that the Motions for Joinder to Gonzalez's Motion for Leave filed by Perez, Coleman, Garcia, Neddenriep, Voll, Juarez, and Davisson, (ECF Nos. 994, 1018, 1023, 1029, 1079, 1087, 1111), are **GRANTED**.

**DATED** this __10__ day of ▮▮▮, 2019.
                               May

_____

Gloria M. Navarro, Chief Judge
United States District Court